UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF WISCONSIN
GREEN BAY DIVISION



ERIC EHMANN,

    PLAINTIFF,

v.

KELLY SERVICES, INC.,
a Foreign Corporation
    and
PIERCE MANUFACTURING, INC.,
a Domestic Corporation

    DEFENDANTS.

Case No. 17-C-903

CIVIL ACTION

**JURY TRIAL DEMANDED**

## COMPLAINT

### PRELIMINARY STATEMENT

1. Now comes Plaintiff, *pro se*, Eric Ehmann, ("Plaintiff"), formerly an hourly production worker employed by Defendants from August 24, 2015, until March 22, 2017, at which time Plaintiff's employment was terminated by Defendants for the stated reason of "attendance violations".

2. Defendant Kelly Services, Inc., ("Defendant Kelly"), is a Troy, Michigan, corporation with a place of business in Appleton, Wisconsin, and which engages in recruitment and staffing for client firms throughout the United States, including Defendant Pierce Manufacturing, Inc.

3. Defendant Pierce Manufacturing, Inc., ("Defendant Pierce"), is an Appleton, Wisconsin, corporation that manufactures and assembles fire trucks and apparatus which are sold throughout the United States.
4. Plaintiff asserts, as the evidence clearly demonstrates and as the grounds for this action, that his termination was not in fact due to "attendance violations" but was instead a direct response to his statutorily-protected activities relating to his employment at Defendants, specifically his filing on February 29, 2016, a federal lawsuit against Defendant Pierce under the Fair Labor Standards Act of 1938, as amended, ("FLSA"), constituting unlawful retaliation in violation of the FLSA, 29 U.S.C. §§ 201, et seq.
5. Plaintiff therefore brings this action pursuant to 28 U.S.C. § 1331 for purposes of obtaining relief under the FLSA in the form of reinstatement at work as a permanent, directly-employed hourly production worker at Defendant Pierce, with the complete wage and benefit package typical thereto, monetary compensation for damages including unpaid agreed upon wages, unpaid overtime compensation, unpaid 401(k) retirement plan benefits, unpaid college tuition reimbursement, liquidated damages, compensatory damages including for emotional pain and suffering and for other economic damages, pre-judgment interest, reimbursement of costs, attorney fees, declaratory and/or injunctive relief, and/or any other relief the Court deems proper.

## JURISDICTION AND VENUE

6. This Court has original federal question jurisdiction under 28 U.S.C. § 1331 because this case is brought under the FLSA, 29 U.S.C. §§ 201, et seq.
7. Venue in this district is proper pursuant to 28 U.S.C. § 1391(b), (c), and (d), because all, or a substantial part, of the events or omissions giving rise to the claims in this action occurred in this District, and because Defendants reside, and/or have substantial and systematic contacts, in this District.

## PARTIES

8. Plaintiff is a resident of the State of Wisconsin who resides in Appleton, Wisconsin.
9. Defendant Kelly is a Michigan corporation with a principal place of business of 999 W. Big Beaver Road, Troy, Michigan, 48084.

10. Defendant Kelly's registered agent for service of process in the State of Wisconsin is CT Corporation System, 301 S. Bedford Street, Suite 1, Madison, Wisconsin 53703.
11. Defendant Pierce is a Wisconsin corporation with a principal place of business of 2600 American Drive, Appleton, Wisconsin 54914.
12. Defendant Pierce's registered agent for service of process in the State of Wisconsin is CT Corporation System, 301 S. Bedford Street, Suite 1, Madison, Wisconsin 53703.
13. Defendants are employers, and joint-employers, of Plaintiff, and Plaintiff is employed, and jointly employed, by Defendants, pursuant to 29 U.S.C. §§ 791.2(a) and (b), and 29 U.S.C §§ 203(d) and (e).
14. Plaintiff has been employed by Defendants as a non-exempt, hourly production employee within the last year of the date of filing of this Complaint.
15. Plaintiff performed compensable work at a physical location in Appleton, Wisconsin, owned and operated by Defendant Pierce.
16. Plaintiff was economically dependent on Defendant Pierce, which engaged Defendant Kelly to assign Plaintiff for the purpose of performing compensable work at Defendant Pierce's Appleton location.
17. At all times material herein, Defendant Kelly was engaged in a long-term business relationship with Defendant Pierce, which contracted Defendant Kelly to provide a substantial percentage of Defendant Pierce's work force of hourly production employees, including Plaintiff.
18. At all times material herein, Defendant Kelly had offices on-site at Defendant Pierce's physical locations, which were staffed full-time by agents of Defendant Kelly who worked closely with management of Defendant Pierce to jointly manage Plaintiff and other similarly-situated employees.
19. Plaintiff's hours of work were tracked and recorded by both Defendants.
20. Defendants Kelly and Pierce supervised Plaintiff's activities during his daily working shift.
21. Defendants Kelly and Pierce had the ability and authority to hire, terminate, promote, demote, and/or suspend Plaintiff.
22. Defendants Kelly and Pierce had the ability and authority to review Plaintiff's work performance.

23. Defendants Kelly and Pierce established the work rules, policies, and procedures by which Plaintiff abided in the workplace.
24. Defendants Kelly and Pierce controlled the terms and conditions of Plaintiff's employment.
25. Defendants Kelly and Pierce established Plaintiff's work schedules and provided Plaintiff with work assignments and hours of work.

## FACTS

26. In about July of 2015 Plaintiff applied to Defendant Kelly for a position as a non-exempt production worker at Defendant Pierce's production plant in Appleton.
27. The primary reasons Plaintiff applied for a job at Defendants were that they offered a first shift schedule Monday through Friday from 4:15 am to 1:25 pm, which was compatible with Plaintiff's child care needs, and because Defendant Pierce offered college tuition reimbursement to its employees, which was important to Plaintiff because he was previously a college student and planned to return to earn a degree in order to advance his career at Defendant Pierce.
28. During Plaintiff's application process, an agent of Defendant Kelly, Sara Mader, ("Mader"), confirmed that workers assigned to Defendant Pierce would either be hired directly, or terminated from the assignment, within six months of their start date.
29. During the application process, Plaintiff advised Mader of previously-scheduled out-of-town trips that Plaintiff's family was planning to take in October of 2015.
30. Mader told Plaintiff to inform his team lead at Defendant Pierce about his travel plans as soon as possible after beginning work, so that Plaintiff could get excused unpaid time off.
31. About a week or so after beginning work at Defendant Pierce on August 24th, 2015, Plaintiff informed his team lead at Defendant Pierce, Brent Cloutier, ("Cloutier"), as well as an agent of Defendant Kelly, Brook Sanchez, ("Sanchez"), that Plaintiff had pre-existing travel plans and that he needed to request permission for unpaid time off.
32. Cloutier and Sanchez told Plaintiff that there was no process or policy for requesting unpaid time off, and that while Plaintiff's absence from work on those dates would not be a "problem", the absences would nevertheless be recorded as attendance policy violations.

33. Plaintiff was assured that while the absences would be recorded as violations, they wouldn't actually be used against him in evaluating his performance or making a hiring decision.
34. Eventually Plaintiff would discover that in fact there was a written policy and procedure for requesting unpaid time off.
35. However, up until April 11, 2016, at no time did Plaintiff receive any further explanation of an attendance policy, nor did Plaintiff ever see, read, or receive a copy of one.
36. On multiple occasions in about late 2015 and early 2016 Plaintiff was told by Cloutier that he had recommended Plaintiff for conversion to a permanent employee.
37. During that time Plaintiff was also told by his supervisor at Defendant Pierce, Mark Peterson, ("Peterson"), that he had recommended Plaintiff for conversion.
38. In early January of 2016, upon Plaintiff's return to work following a holiday break, Peterson told Plaintiff with respect to his conversion that "we will take care of you."
39. Peterson acknowledged to Plaintiff on several occasions that Plaintiff was a hard worker who was conscientious, got along well with co-workers, and was a valued employee.
40. Peterson indicated to Plaintiff that his production efficiency was above 100%.
41. At no time during Plaintiff's employment by Defendants did Plaintiff receive a verbal warning, written warning, write-up, or other disciplinary action of any kind resultant of attendance violations, or any other sort of violations.
42. In December of 2015 Plaintiff had a performance review conducted and administered in person by Peterson, in which Peterson rated Plaintiff as "meeting expectations" in all areas.
43. In the "Opportunities for Development" section, Peterson's only comment was that Plaintiff could improve his attendance.
44. However, the performance review indicates that Plaintiff received no warnings or write-ups for attendance, or any other violations.
45. Eventually, Defendant Pierce would deny that it had performed Plaintiff's performance review, on page 4, paragraph 20, of its answer to Plaintiff's FLSA lawsuit filed in February of 2016. That assertion is false and contradicted by the evidence.

46. In about mid-February of 2016, Plaintiff was advised by agent of Defendant Kelly, Bess Calhoun, ("Calhoun"), that Plaintiff was an employee in good standing and due to be converted to a permanent employee.
47. On February 29, 2016, Plaintiff filed a federal lawsuit against Defendant Pierce under the FLSA, seeking the recovery of unpaid wages for himself and thousands of other workers employed by Defendants.
48. On March 2, 2016, local NBC television affiliate WGBA Channel 26 aired a story about the lawsuit during their 10:00 pm newscast, which included an interview with Plaintiff and identified Plaintiff as the person responsible for the lawsuit.
49. On multiple occasions from approximately early March, 2016, until March 30th, 2016, and in fact up to and including Plaintiff's termination in March of 2017, Plaintiff was the victim of adverse action taken against him by Defendants in retaliation for Plaintiff's FLSA lawsuit and his activities pertaining thereto.
50. On multiple occasions in March of 2016, unknown members of management and/or security removed Plaintiff's informational flyers from employee breakrooms and employee vehicle windshields in the parking lot at work.
51. On March 10, 2016, at the beginning of Plaintiff's shift, Cloutier called Plaintiff to his desk and advised that he was going to read a memo concerning the FLSA lawsuit during the daily safety meeting, and told Plaintiff not make any comments or ask any questions about it. Plaintiff said OK. Cloutier later read the memo at the safety meeting, and told the workers in attendance that they should not ask him about it.
52. On March 14, 2016, while placing informational flyers about the FLSA lawsuit in an employee break room, Plaintiff was approached by a vice president of Defendant Pierce, Jim Michal, ("Michal"), who told Plaintiff that Plaintiff wasn't allowed to place the forms there, and that Plaintiff should follow him to the human resources department.
53. Michal led Plaintiff to the human resources department where director of human resources at Defendant Pierce, Diane Haase, ("Haase") instructed Plaintiff that he was not allowed to place such forms in the break rooms, therefore they would be removed and destroyed.
54. Haase then asserted the falsehood that all existing employee break room postings had been pre-approved for posting by human resources.

55. Plaintiff questioned several of his co-workers who had placed postings on bulletin boards, all of whom told Plaintiff that they had never sought nor received approval of their posts from human resources, nor were they aware of any policy requiring such.
56. On March 14, 2016, local NBC television affiliate WGBA Channel 26 aired another story about the lawsuit, featuring an interview with Plaintiff, during their 6:00 pm and 10:00 pm broadcasts.
57. On March 22, 2016, Plaintiff was approximately 30 minutes late for work as a result of his car breaking down, which resulted in Plaintiff junking the car and buying a new one.
58. On March 30, 2016, Plaintiff was approached at his work station by vice president of Defendant Pierce, Joe Sell, and Michal, who instructed Plaintiff to follow them to the human resources department, which he did.
59. Upon arriving at human resources, Plaintiff was provided a letter from Haase, which stated that Plaintiff was being placed on indefinite paid suspension pending the outcome of a disciplinary investigation into allegations that Plaintiff violated Defendants' attendance and solicitation policies.
60. On April 1, 2016, Defendant Pierce filed a motion in federal court in which Plaintiff was falsely accused of engaging in improper and misleading communication and solicitation at work regarding the FLSA lawsuit. Further, Defendant Pierce falsely accused Plaintiff of violating various workplace rules and policies, such as by placing his informational flyers in inappropriate locations at work, and of trying to "harm" the reputation of Defendant Pierce by engaging in "abusive" and unlawful activity. None of those allegations had any basis in fact, and seem to have been intended to harm the reputation and standing of Plaintiff in the context of seeking relief for Defendants' improper, abusive, and unlawful actions. Defendant Pierce eventually withdrew its motion.
61. On April 6, 2016, local NBC television affiliate WGBA Channel 26 aired another story about the lawsuit, during their 10:00 pm newscast, featuring an interview with Plaintiff.
62. Prior to being placed on leave and throughout the period of his employment at Defendants, Plaintiff on several occasions requested a copy of an attendance policy but was never provided one.
63. Subsequent to being placed on leave Plaintiff again requested a copy of an attendance policy, and he received one in the mail on April 11, 2016.

64. The attendance policy Plaintiff received contained a provision for employees to request unpaid time off from work, in contradiction to previous statements to Plaintiff by Cloutier and Sanchez.
65. Also included with the policy was a computer-generated attendance record indicating a chronological accounting of Plaintiff's alleged absences and tardies from work, with their corresponding dates.
66. That policy included a chart of "Point Occurrences" which outlined the number of "points" that would be incurred under various circumstances described as "Type of Point Occurrence".
67. The chart indicates that for "Approved Absences", zero (0) points will accrue; for "Tardy or Leaving Early", one-half (.5) point will accrue; and for an "Unscheduled Absence", one (1) point will accrue.
68. The first eight absences and tardies listed in the record, chronologically, are correct insofar as that in six of the eight instances Plaintiff was in fact absent from his regularly scheduled shifts, in one instance Plaintiff left work early, and in the remaining instance Plaintiff was tardy.
69. However, the record does not reflect the fact that two of the six absences listed, specifically, those dated October 5, 2015, and October 19, 2015, were resultant of pre-existing travel plans Plaintiff had made prior to starting work at Pierce, which actually should have been "Approved Absences" for which no points would have accrued, per the written attendance policy.
70. The record indicates an absence on November 19, 2015, which was in fact an instance where Plaintiff left work early, at the direction of Cloutier, due to illness, and he should therefore have accrued only .5 point.
71. Plaintiff's paystub for the week in which Plaintiff was absent on November 19th, 2015, confirms that Plaintiff had left work early on the 19th because it reflects a total of 39 hours worked instead of the typical 44 (when given permission to leave work early, workers were generally required to complete the first 4 hours of their 9 hour shift, thus Plaintiff's work week was cut short by 5 hours because Plaintiff did in fact leave work after completing only 4 hours on the 19th).

72. The record also indicates an absence on December 29, 2015, which is impossible because Plaintiff had been given the entire week of December 27 through January 2 off by Peterson.
73. That week was a scheduled shutdown week when all or most employees had the entire week off. Plaintiff was told when he started work that he would not be scheduled to work during that shutdown week, but then in about mid-December, 2015, Plaintiff was told that he would in fact be required to work during the shutdown.
74. However, because Plaintiff had been under the impression from the beginning of his employment that he would not have to work that week, Plaintiff had not arranged child care for his six-year-old who was on vacation from school at the same time.
75. When Plaintiff explained this situation to Peterson, he agreed to give Plaintiff the week off, therefore Plaintiff was not scheduled to work, nor did Plaintiff work, at all during shutdown week, therefore Plaintiff could not possibly have had any attendance violations whatsoever during that time.
76. Because Plaintiff did not work at all during that week, he did not receive any pay, or a paystub, for that week.
77. According to the record Plaintiff received, the cumulative points that would have accrued per the policy as a result of Plaintiff's absences and tardies as of December 17, 2015 (and ignoring the later, incorrectly attributed absence of December 29, 2015), equal 7 Points (including 2 Points from what should have been recorded as "Approved Absences", on October 5, 2015, and October 19, 2015).
78. The policy Plaintiff received on April 11, 2016, included another chart under the header of "Progressive Discipline", outlining various numbers of "Total Points" which, when accrued, will result in an employee receiving specific corresponding "Types of Coaching and Progressive Disciplinary Action".
79. The "Progressive Discipline" chart indicates that upon accruing various point totals, employees will be subject to, in ascending order of severity, "Verbal Coaching", "Verbal Warning", "First/Final Written Warning", and "Termination of Employment".
80. Although Plaintiff did not receive any warnings or other sort of disciplinary action resultant of attendance violations (or any other kind of violation), Plaintiff is aware of other employees who accrued points because of attendance violations and consequently

received numerous warnings including multiple "final warnings" which did not result in their termination, even though 7 or more points were, or should have been, accrued.

81. Plaintiff is also aware of employees in his own department, who each on at least one occasion in the approximately five-month period preceding March 30, 2016, had a "No Call/ No Show" policy violation, but accrued no points, despite the policy mandating 2 points for each such occurrence.

82. Between December 17, 2015, and filing the FLSA lawsuit on February 29, 2016, Plaintiff had no attendance (or any other kind of) policy violations, and was in fact advised by Calhoun and Peterson that Plaintiff was in "good standing" and due to be hired.

83. Subsequent to filing the FLSA lawsuit on February 29, 2016, Plaintiff had only one attendance violation, the aforementioned tardy of March 22, 2016, when Plaintiff's car broke down.

84. Thus, the tardy of March 22, 2016 – Plaintiff's only violation in more than three months' time - could have had no meaningful effect on Plaintiff's attendance record, as Plaintiff had – if Defendants' accounting is true – long since reached the number of points for which termination was prescribed in the policy (back in December of 2015) or, alternatively - if Plaintiff's accounting is true (which Plaintiff believes is the case) - the total points accrued including the tardy of March 22, 2016, would have actually been fewer than 7, therefore, *in either case*, that tardy should not have resulted in suspension or termination.

85. Additionally, it is notable that in Plaintiff's written performance review in December of 2015, the sole category identified for potential improvement was attendance, which Plaintiff responded to by achieving perfect attendance for the subsequent three month period, up until his car broke down and he was 30 minutes late for work on March 22, 2016.

86. At no time prior to being placed on suspension on March 29, 2016, did Plaintiff receive any of the prescribed warnings or write-ups for attendance violations, as outlined in the attendance policy.

87. On January 6, 2017, Plaintiff signed a settlement agreement in the FLSA lawsuit.

88. On February 17, 2017, Plaintiff received a letter from vice president of human resources at Defendant Pierce, Kim Reese, directing Plaintiff to appear at the Comfort Suites hotel

in Appleton on March 1st, 2017, for the purpose of being questioned about a non-criminal citation for a municipal ordinance violation which Plaintiff received from the City of Appleton in August of 2016.

89. That citation was for disorderly conduct concerning Plaintiff's interaction with what Plaintiff believes (and at the time asserted) was a nuisance trespasser (who was a minor child) on his property.

90. Neither the conduct in question, nor the circumstances of the event, had any relationship to, or bearing on, Plaintiff's employment at Defendants.

91. On March 1, 2017, Plaintiff appeared as directed at the Comfort Suites in Appleton, Wisconsin, where he met Diane Biersteker, ("Biersteker"), of Human Resources Consulting, LLC, and Haase.

92. Biersteker explained to Plaintiff that Defendant Pierce had retained her firm to investigate Plaintiff's conduct surrounding the events of August, 2016 (which had resulted in Plaintiff receiving the aforementioned non-criminal municipal citation) in order to ascertain whether his conduct would "affect" their "relationship" going forward.

93. Biersteker questioned Plaintiff for about 30 minutes about the circumstances surrounding his citation, and whether he had previous such citations or criminal convictions.

94. Plaintiff answered all questions truthfully.

95. Upon the conclusion of the meeting, Biersteker advised Plaintiff that she would provide the results of her investigation to Defendant Pierce and, she assumed, Defendant Pierce would inform Plaintiff of its findings and determination at a later date.

96. However, Plaintiff was never informed of any findings or determination.

97. On March 9, 2017, Plaintiff emailed Haase to inquire about the status of the aforementioned investigation. Plaintiff received no response.

98. At 11:06 am on March 22, 2017, Plaintiff again emailed Haase to inquire about the status of his suspension. Plaintiff received no response.

99. At about 5:00 pm on March 22, 2017, Plaintiff received a call from someone identifying herself as "Tara", at Defendant Kelly's Appleton office.

100. Tara said she was calling to inform Plaintiff that his employment was terminated, effective immediately. When Plaintiff asked what the reason for the termination was, Tara stated "attendance violations".

101. At the time of his termination, Plaintiff had been on paid suspension for about 51 weeks, and had committed no attendance violations in that time.

102. In early April of 2017 employees of Defendant Pierce told Plaintiff that members of management had been circulating information at work the previous week, among production workers, identifying Plaintiff as a sex-criminal. That allegation is patently false. Plaintiff has never been charged or convicted of any such crime, or anything remotely similar.

103. In early April of 2017 Plaintiff received from an employee of Defendant Pierce a computer-generated printout produced by the Outagamie County Clerk of Court's office, which was a record of the aforementioned non-criminal municipal citation Plaintiff received in August of 2016.

104. The printout showed the un-redacted name and birthdate of the minor-child involved in the incident, and had been illustrated by hand to apparently emphasize that Plaintiff had victimized the minor-child.

105. The employee who provided the printout to Plaintiff advised that it had been circulated at work by members of management who had placed a copy of it on every workstation in "chassis line" ("chassis line" refers to a particular area of the assembly line in the manufacturing plant where Plaintiff had worked).

106. At about the same time, multiple employees of Defendant Pierce advised Plaintiff that the rumor going around at work was that Plaintiff was originally charged with a sex-crime against the minor-child named in the aforementioned report, but that Plaintiff successfully pled the charge down to an ordinance violation.

107. At about the same time, another employee of Defendant Pierce advised Plaintiff that he was privy to a conversation at work in which the president of Defendant Pierce, Jim Johnson, described Plaintiff as a criminal who had gone to prison for trying to extort a previous employer. That defamatory allegation has no basis in fact and is a fabrication from whole cloth.

# COUNT ONE

## Violation of the Fair Labor Standards Act of 1938, as Amended

108.   Plaintiff reasserts and incorporates by reference all paragraphs set forth above as if restated herein.

109.   At all times material herein, Plaintiff has been entitled to the rights, protections, and benefits provided under the FLSA, 29 U.S.C. § 201 et seq.

110.   At all times material herein, Defendants were employers of Plaintiff pursuant to the FLSA, 29 U.S.C §§ 203(d) and (e).

111.   At all times material herein, Plaintiff was an employee of Defendants pursuant to the FLSA, 29 U.S.C §§ 203(d) and (e).

112.   Plaintiff filed a lawsuit seeking the recovery of unpaid wages under the FLSA in February of 2016, which constitutes statutorily-protected activity pursuant to FLSA 29 U.S.C. § 215(a)(3).

113.   In response to Plaintiff filing his FLSA lawsuit, Defendants have taken adverse, retaliatory action against Plaintiff.

114.   The FLSA prohibits any and all manner of adverse action taken by an employer against an employee who has engaged in certain statutorily-protected actions, including filing a lawsuit, pursuant to 29 U.S.C. § 215(a)(3).

115.   Defendants asserted at the time of Plaintiff's termination in March of 2017 that Plaintiff was in violation of Defendants' attendance policy.

116.   However, it is clear by Defendants' established failure to uniformly and consistently apply and enforce their attendance and solicitation policies, either in the case of the Plaintiff or in the case of other similarly-situated employees, that Defendants' use of said policies as the alleged basis for taking adverse action against Plaintiff was in fact, as clearly demonstrated by the facts and evidence described herein, a pre-textual contrivance designed to conceal Defendants' retaliation against Plaintiff.

117.   Further, to the extent that Plaintiff had actually been in violation of Defendants' attendance policy, the facts and evidence referenced herein plainly show that, contemporaneous to all of Plaintiff's commissions of any such violations (save the last), Defendants willfully declined to administer or impose even the slightest disciplinary or

corrective action in response, and on the contrary going so far as to refer Plaintiff for conversion to a permanent employee, and then assure him of that conversion, and that it was only after Plaintiff filed the FLSA lawsuit that Defendants' attitude toward, and treatment of, Plaintiff changed, such that upon Plaintiff subsequently being late to work for the first time in more than three months (and indeed, for the first time since Plaintiff began working at Defendants), Defendants responded to the violation not in the same manner in which they had responded to Plaintiff's previous violations (nor in the same manner in which Defendants also declined to enforce the attendance policy vis-à-vis violations of same committed by other, similarly-situated employees), but by using it to concoct a pre-textual basis for Plaintiff's termination, in violation of the FLSA.

118. By a pattern and practice illustrated by the actions and omissions described herein, Defendants acted willfully and knew, or showed reckless disregard for whether, their conduct was prohibited by the FLSA.

119. As a result of Defendants' willful violations of the FLSA, Plaintiff has been unlawfully deprived of wages, fringe benefits, and retirement income, and suffered diminished future earning capacity, tarnishment of his reputation, emotional distress, humiliation, embarrassment, and the loss of opportunities he would have consequently enjoyed as a permanent employee, and has suffered other damages, because of Defendants' retaliation in violation of the FLSA.

120. Defendants have not acted in good faith nor with reasonable grounds to believe their actions and omissions were not a violation of the FLSA, and accordingly the FLSA allows for and/or requires remedies for the Plaintiff, including: employment, reinstatement, promotion, lost wages, liquidated damages, front pay, compensatory damages, punitive damages, pre-judgment interest, and attorney's fees. 29 U.S.C. § 216(b).

# CLAIM FOR RELIEF

**WHEREFORE**, Plaintiff demands a TRIAL BY JURY and requests that this Court grant the following relief:

a.) At the earliest possible time, pursuant to the Declaratory Judgment Act, 28 U.S.C. §§ 2201-2202, issue an Order declaring Defendants' actions as described in the Complaint as unlawful and in willful violation of the FLSA;

b.) Issue an Order directing and requiring Defendants to reinstate Plaintiff as a permanent employee, in the same capacity and position and on the same shift as he previously worked;

c.) Issue an Order directing and requiring Defendants to pay damages in the form of reimbursement for unpaid wages including unpaid overtime wages;

d.) Issue an Order directing and requiring Defendants to pay damages in the form of pre-judgment interest on unpaid wages and overtime wages,

e.) Issue an Order directing and requiring Defendants to pay Plaintiff liquidated damages in an amount equal to, and in addition to, the amount of wages and overtime wages owed to him;

f.) Issue an Order directing and requiring Defendants to pay damages in the form of reimbursement for lost and un-accumulated fringe benefits including but not limited to 401(k) contributions to Plaintiff's retirement account;

g.) Issue an Order directing and requiring Defendants to pay compensatory damages for emotional pain and distress suffered by Plaintiff;

h.) Issue an Order directing and requiring Defendants to pay compensatory damages for other economic damages suffered by Plaintiff;

i.) Issue an Order directing and requiring Defendants to pay punitive damages;

j.) Issue an Order directing Defendant to reimburse Plaintiff for the costs and attorneys' fees expended in the course of litigating this action, and

k.) Provide Plaintiff with such other and further relief, as this Court deems just and equitable.

## DEMAND FOR JURY TRIAL

Plaintiff demands a jury trial for all triable issues.

Respectfully submitted this 30th day of June, 2017

**Eric Ehmann**

*[signature]*

Plaintiff, *pro se*
P.O. Box 2366
Appleton, WI 54912
eric.t.ehmann@gmail.com
(920) 659-9335